UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IRWIN J. BERLIN, individually individually and on behalf of all others similarly situated, | § § § | |
| Plaintiff, | § § | Civil Action No. 4:14-cv-02644 |
| v. | § § | JURY TRIAL DEMAND |
| | § | |
| ALAN L. SMITH, JOHN H. CAMPBELL, JR., DONALD D. WOLF, STEPHEN A. THORINGTON, DONALD E. POWELL, RICHARD K. HERBERT, TOBY R. NEUGEBAUER, S. WIL VANLOH, JR., QR ENERGY LP, QRE GP, LLC, BREITBURN ENERGY PARTNERS LP, BREITBURN GP, LLC, and BOOM MERGER SUB, LLC, | § § § § § § § § § § | |
| Defendants. | § § | |

## CLASS ACTION COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff Irwin J. Berlin, ("Plaintiff") alleges upon personal knowledge as to his own acts and upon information and belief as to all other matters, based upon the investigation made by and through his attorneys, which investigation included, *inter alia*, the review of United States Securities and Exchange Commission ("SEC") filings, press releases, analyst reports, news articles and other materials, as follows:

## I.   NATURE OF THE CASE

1.   Plaintiff brings this class action individually and on behalf of all other similarly situated unitholders of QR Energy L.P. ("QR Energy" or the "Partnership") against QR Energy, its general partner, QRE GP, LLC ("QRE GP"), and QRE GP's Board of Directors (the "Board" or the "Individual Defendants," identified below), Breitburn Energy Partners L.P. ("Breitburn"), Breitburn's general partner, Breitburn GP, LLC ("Breitburn GP"), and Boom Merger Sub, LLC

("Merger Sub") (collectively with Breitburn and Breitburn GP, the "Buyout Group") in connection with their attempt to sell the Partnership to Breitburn by means of an unfair process and for an unfair price.  Plaintiff also brings claims against Defendants (defined herein) for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.     On July 24, 2014, the Buyout Group and the Partnership announced that they had entered into an Agreement and Plan of Merger (the "Merger Agreement") that will culminate in the Buyout Group, through Merger Sub, acquiring all of the outstanding units of QR Energy in a unit-for-unit transaction valued at approximately $3.0 billion.  QR Energy unitholders are expected to receive only 0.9856 of a common unit of Breitburn in exchange for each unit of QR Energy they own (the "Merger").  Based on the closing price of Breitburn on July 23, 2014, the last trading prior to the announcement of the Merger, the implied value of the total consideration that the Partnership's unitholders will receive is approximately $22.48 per unit.

3.      The Board has violated QR Energy's partnership agreement dated December 22, 2010 ("LPA," as further described below), and breached their express and implied contractual duties owed and fiduciary duties to Plaintiff and other QR Energy unitholders by agreeing to the Merger for grossly inadequate consideration.  As described in more detail below, given QR Energy's recent strong performance as well as its future growth prospects, the consideration unitholders will receive is inadequate and undervalues the Partnership.

4.     The Individual Defendants, as defined herein, have exacerbated their breaches of fiduciary duty by agreeing to lock up the Merger with preclusive and onerous deal protection devices that preclude other bidders from making successful competing offers for the Partnership and act to render the Merger a *fait accompli*.  For example, the Board agreed to: (i) a "no shop" provision that prevents the Partnership from negotiating with or providing confidential

information to competing bidders except under extremely limited circumstances; (ii) a "matching rights" provision that allows Breitburn to match any competing proposal in the unlikely event that one emerges; and (iii) a $64,875,000 million termination fee if the Board agrees to a competing proposal. These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives to the Merger.

5.       In addition, in connection with the Merger, on August 20, 2014, Breitburn filed a Form S-4 Registration Statement ("Registration Statement") with the SEC that failed to make all material disclosures and contained materially misleading statements about the Merger. As explained below, the Registration Statement exposes some details of the highly flawed sales process, but fails to disclose a myriad of material facts concerning the Merger or provides unitholders with materially misleading information, thereby rendering unitholders unable to make an informed decision on whether to vote in favor of the Merger.

6.       Consequently, the Individual Defendants have breached their fiduciary duties of loyalty and due care, and the Buyout Group has aided and abetted such breaches by QR Energy's officers and directors.

7.       For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Merger, or in the event the Merger is consummated, recover damages resulting from the Individual Defendants' violations of their fiduciary duties of loyalty, good faith, due care, and full and fair disclosure.

## II.      JURISDICTION AND VENUE

8.       This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder. The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

9.      The Court has personal jurisdiction over each of the Defendants because each either is organized under the laws of, conducts business in and maintains operations in this District, or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

III.   **PARTIES**

11.      Plaintiff is, and has been at all relevant times, the owner of common units of QR Energy.  Plaintiff is a resident of Florida.

12.      Defendant Alan L. Smith ("Smith") has been the Chief Executive Officer ("CEO") and a director of QRE GP since 2009.  He is also a General Partner of QR Energy.

13.      Defendant John H. Campbell, Jr. ("Campbell") has been the President, Chief Operating Officer and a director of QRE GP since 2009.  He is also a General Partner of QR Energy.

14.      Defendant Donald D. Wolf ("Wolf") is a founder of QR Energy and has been the Chairman of QRE GP since 2009.  He previously served as the CEO from 2006 to 2009.

15.     Defendant Stephen A. Thorington ("Thorington") has served as a director of QRE GP since 2011.  He is also the Chairman of the Audit Committee and a member of both the Compensation Committee and Conflicts Committee.

16.     Defendant Donald E. Powell ("Powell") has served as a director of QRE GP since 2011.  He is also the Chairman of the Conflicts Committee and a member of both the Audit Committee and Compensation Committee.

17.     Defendant Richard K. Herbert ("Herbert") has served as a director of QRE GP since 2011.  He is also the Chairman of the Compensation Committee and a member of the Audit Committee and Conflicts Committee.

18.     Defendant Toby R. Neugebauer ("Neugebauer") is a founder of QR Energy and has served as a director of QRE GP since 2010.

19.     Defendant S. Wil VanLoh, Jr. ("VanLoh") has served as a director of GRE GP since 2010.

20.     Defendant QR Energy is a limited partnership organized and existing under the laws of the State of Delaware.  It maintains its principal executive offices at 1401 McKinney Street, Suite 2400, Houston, Texas, 77010.  Its common units are listed on the New York Stock Exchange under the symbol "QRE."

21.     Defendant QRE GP is the general partner of the Partnership.  Importantly, as is common among publicly traded limited partnerships, the Partnership is managed by QRE GP's directors and officers.  QRE GP is a Delaware limited liability company.

22.     Defendant Breitburn is a limited partnership organized and existing under the laws of the State of Delaware.  Breitburn's principal executive offices are located at 1515 South Flower Street, Suite 4800, Los Angeles, California, 90071.  Its common units trade on the NASDAQ Global Select Market under the symbol "BBEP."

23.     Defendant Breitburn GP is a wholly-owned subsidiary of Breitburn.

24.     Defendant Merger Sub is a Delaware limited liability company and wholly-owned subsidiary of Breitburn created for purposes of the Merger.

25.     Defendants set forth in paragraphs 12 to 19 are referred to herein as the "Board" or the "Individual Defendants."

26.     Defendants set forth in paragraphs 12 to 24 are referred to herein as the "Defendants."

## IV.     CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons that own QR Energy common units (the "Class") as of July 24, 2014, the date on which the Merger was announced.  Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

28.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  According to the Registration Statement, as of July 30, 2014, approximately 58,840,314 million units were represented by the Partnership as outstanding.  All members of the Class may be identified from records maintained by QR Energy or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

29.     Questions of law and fact are common to the Class, including:

(i)      Have the Individual Defendants breached their obligations to act in good faith and/or fiduciary duties of undivided loyalty or due care with respect to Plaintiff and the other members of the Class in connection with the Merger;

(ii)     Have the Individual Defendants breached or violated any of the terms and conditions of the LPA in connection with the Merger;

(iii)    Have the Defendants violated the implied covenant of good faith and fair dealing by entering into the Merger Agreement;

(iv)    Have the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Merger;

(v)     Have the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Partnership or its assets;

(vi)    Whether Defendants failed to provide Plaintiff and the other members of the Class with true, full and fair disclosure of all material information in connection with the Merger;

(vii)   Whether the Registration Statement contains material misrepresentations and/or omissions in violation of federal laws;

(viii)  Has the Buyout Group aided and abetted the Individual Defendants' breaches of fiduciary duty;

(ix)    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated; and

(x)     Is the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

7

30.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

31.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

32.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class, and conflicting adjudications for individual members of the Class might, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.  Moreover, Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## V.     OBLIGATIONS AND FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

34.     By reason of the Individual Defendants' positions with the Partnership as officers and/or directors of QRE GP, said individuals are in a fiduciary relationship with Plaintiff and the other unitholders of QR Energy and owe Plaintiff and the other members of the Class, as well as the Partnership, at a minimum an implied contractual duty of good faith and fair dealing.

35.     The relationship between QRE GP's Board and its public unitholders is, in part, governed by the LPA – i.e., the First Amended and Restated Agreement of Limited Partnership of QR Energy, LP dated December 22, 2010.

36.     Section 3.1 of the LPA states: "The Limited Partners shall have no liability under this Agreement except as expressly provided in this Agreement or the Delaware [Revised Uniform Limited Partnership Act, 6 Del C. Section 17-101, et seq., as amended, supplemented or restated from time to time, and any successor to such statute ("Delaware Act")]."

37.     Under the Delaware Act, partnership agreements in Delaware cannot "eliminate the implied contractual covenant of good faith and fair dealing." *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 100 (Del. 2013).

38.     By virtue of their positions as directors of QRE GP, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause QR Energy to engage in the practices complained of herein.

39.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Partnership's unitholders and with due care.  In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value unitholders will receive rather than use a change of control to benefit themselves, and to disclose all material information concerning the proposed change of control to enable the unitholders to make an informed voting decision.  To diligently comply with this duty, the directors of a corporation may not take any action that:

     a.     Adversely affects the value provided to the corporation's unitholders;

     b.     Contractually prohibits them from complying with or carrying out their fiduciary duties;

     c.     Discourages or inhibits alternative offers to purchase control of the corporation or its assets;

d.     Will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's unitholders; or

e.     Will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public unitholders.

40.    Moreover, Section 3.4 of the LPA provides that unitholders have the right "to obtain true and full information regarding the status of the business and financial condition of the Partnership" and "to obtain such other information regarding the affairs of the Partnership as is just and reasonable."

41.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Merger, violated duties owed to Plaintiff and the other unitholders of QR Energy, including their express and implied duties under the LPA and their duties of loyalty, good faith, candor and independence under both the Partnership's LPA and under governing Delaware law, and have failed to provide Plaintiff and other QR Energy unitholders with true, full, and fair disclosures concerning the Merger.

## VI.   SUBSTANTIVE ALLEGATIONS

### A.   Partnership Background and Its Poise for Growth

42.    QR Energy is a Delaware limited partnership formed on September 20, 2010, to acquire oil and natural gas assets from its predecessor, QA Holdings, LP ("QA Holdings"), and other third-party entities to enhance and exploit oil and gas properties.  In particular, QR Energy is engaged in the acquisition, exploitation, development and production of oil and natural gas properties.  The Partnership's properties consist of mature, legacy onshore oil and natural gas reservoirs with long-lived, predictable production profiles, located in Alabama, Arkansas, Florida, Kansas, Louisiana, Michigan, New Mexico, Oklahoma, and Texas.

43.     As of June 30, 2014, QR Energy's ownership structure consisted of a 7.5% limited partnership interest held by its affiliates and former owners of QRE GP, a 29.2% limited partner interest held by certain of QA Holdings' subsidiaries, and a 63.3% interest held by its public unitholders.

44.     QR Energy has three classes of units: common units, which have limited voting rights, Class B units, which have all the rights of common units except for the right to vote on matters requiring specific approval by common unitholders, and Class C Preferred units, which have the same voting rights as common units.  In connection with its Long Term Incentive Plan ("LTIP"), QR Energy also periodically issues restricted units with a service condition ("QRE Restricted Units") and restricted units with a market condition ("QRE Performance units").  As of August 5, 2014, there were 6,133,558 Class B Units, 16,666,667 Class C Preferred Units, and 58,840,314 Common Units outstanding.

45.     The Partnership's 2013 fiscal year, ending December 31, 2013, was successful and positioned QR Energy for near and long-term growth.

46.     In a March 3, 2014 press release announcing the Partnership's fourth quarter and full-year 2013 results, Defendant Smith stated he was "very pleased" with the results of the Partnership's production performance and bolt-on acquisitions and expected the Partnership "to build upon [its] 2013 success of optimizing capital allocation and maximizing operating margins from the existing asset base while actively pursuing accretive acquisitions."

47.     Despite this period of transitional growth, the Partnership reported strong financial results for 2013.  As described in the Partnership's 2013 Annual Report, the Partnership's 2013 revenues were $455,629 million, a significant increase compared to revenues of $371,998 million in 2012.  QR Energy also reported an approximate 7% fourth quarter

increase in distributable cash over the third quarter 2013, and close to $70 million in bolt-on acquisitions in the East Texas area.

48.    Additionally, the Partnership expressed optimism about its near- and long-term business prospects.  Defendant Smith touted QR Energy's long-term business prospects in a press release dated March 3, 2014, announcing QR Energy's purchase of QRE GP.  Specifically, Defendant Smith wrote:

> I am pleased to announce this transaction and believe we have structured a deal that is mutually beneficial to the unitholders and the General Partner.  The decision to acquire the GP at this time was derived from QR Energy seeking to enhance its competitiveness in the A&D market with a lower cost of capital, increase future cash flow and reduce complexity in its ownership structure.  The new structure demonstrates QR Energy's commitment to delivering long-term value and growth to our unitholders.

49.    Defendant Smith also commented on QR Energy's near term business prospects in the Partnership's May 7, 2014 press release, announcing first quarter 2014 results, stating:

> We began 2014 operating on all cylinders operationally and successfully integrated our bolt-on acquisitions in East Texas.  We achieved production within our stated guidance despite experiencing winter weather related downtime during the first quarter.  Our operational teams have done a great job of identifying a significant number of additional low-risk projects and when coupled with our recent drilling and workover program success, we made the decision to increase the capital program in 2014.  This incremental growth capital will target oilweighted projects with excellent operating margins in our core operating areas. We are fully capable of executing this capital program with our existing liquidity and current operational resources.

50.    QR Energy has continued to demonstrate its continued growth prospects.  In the May 7, 2014 press release, the Partnership reported total first quarter 2014 natural gas sales of $13.84 million, a significant increase compared to $8.34 million from the same period of the prior year.  The Partnership also increased its capital program by $82 million, for a total of $182 million, in response to continued operational success experienced with organic projects in core operating areas.  Its May 7, 2014 Form 10-Q reported revenues of $122,623,000 for the first quarter of 2014, 16% higher than the $104,886,000 it reported in the first quarter of 2013.

51.     Similarly, on July 24, 2014, simultaneous to the Merger announcement, QR Energy released its preliminary operational and financial results for the Partnership's second quarter 2014, reporting solid increases over the prior quarter.   Specifically, the Partnership reported total revenue of $133.3 million, an increase of 9% compared to the previous quarter. QR Energy's average production also reached 20,264 Barrels of Oil Equivalent ("BOE") per day, an increase of 8% compared to the previous quarter, and the Partnership's adjusted EBITDA increased 7% to $69.6 million.   QR Energy also reported that its distributable cash flows increased 13% over the previous quarter, reaching $34.9 million.

**B.     The Merger**

52.     In August 2013, Defendant Smith, CEO of QRE GP, was approached on an unsolicited basis by the CEO of another upstream master limited partnership ("MLP") referred to in the Registration Statement as "Partnership A" regarding a potential strategic combination with Partnership A.   According to the Registration Statement, they did not discuss any details regarding a potential strategic combination and Partnership A did not make an offer at that time.

53.     In early March 2014, QR Energy management concluded it would be constructive to discuss strategic alternatives, including a potential process to consider a potential merger of QR Energy with other upstream MLPs.   It came to this conclusion because of significant appetite in the industry for low-decline, high-quality conventional assets similar to QR Energy's assets, a supportive commodity price environment and the benefits that size and scale would potentially create for QR Energy's investors, including lower cost of capital, general and administrative synergies and unit yield compression by combining with a lower yield upstream MLP.

54.     On and around March 11, 2014, Defendant Smith and representatives of RBC Capital Markets, LLC ("RBC") approached six upstream MLPs, including Partnership A, to explore whether there was a possibility of a strategic combination that would make sense for QR

Energy.  Defendant Smith personally telephoned the CEOs of five upstream MLPs, including Halbert S. Washburn ("Washburn"), CEO of Breitburn, on March 11, 2014, and RBC contacted the representatives of one additional upstream MLP.

55.     Following these initial conversations, and over the course of several weeks, Defendant Smith met in person with CEOs of five of the six upstream MLPs contacted, including a meeting with Washburn in Houston on March 26, 2014.  In each meeting, the parties discussed potential combinations, and Defendant Smith provided an executive summary of QR Energy's business and operations using exclusively publicly available information.  All six parties were told that if they were interested, all further discussions would require board approval and the execution of a confidentiality agreement.

56.     On April 10, 2014, the Board held a meeting in executive session.  During this executive session, Defendant Smith advised the Board that QR Energy management desired to move forward with a formal process to evaluate the potential for a strategic transaction.  Defendant Smith advised the Board that he had met with CEOs of five upstream MLPs and they had each expressed an interest in further discussions.   QR Energy management requested approval from the Board to engage RBC and Greenhill & Co. ("Greenhill") to evaluate and design a process to initiate discussions and evaluations with potential candidates regarding a strategic transaction and, if appropriate, render a fairness opinion.  QR Energy management recommended Greenhill for this role.  The Board approved the proposed process and authorized the engagement of RBC and Greenhill.  QR Energy management began meeting with potential legal and financial advisors in March 2014, and the Board subsequently retained RBC and Greenhill as financial advisors, and Vinson & Elkins L.L.P., as legal advisor.

57.     Four of the six MLPs previously contacted executed confidentiality agreements with QR Energy, including Partnership A and Breitburn, on April 17, 2014.  Representatives of

RBC and Greenhill subsequently provided the four MLPs with a confidential information memorandum, financial model and reserve report for QR Energy and asked each to provide similar information with respect to itself.

58.     On April 28, 2014, representatives of RBC and Greenhill sent out indicative bid process letters requesting indications of interest by May 13, 2014, and outlining expectations for consideration as unit-for-unit exchanges of all QR Energy common units, Class B units, QR Energy Restricted units and QRE Performance units, and cash consideration of $350 million for the outstanding Class C units, which is equal to the liquidation preference of the Class C units.

59.     On May 1, 2014, Breitburn provided its financial model and reserve report to QR Energy, and on May 7, 2014, RBC and Greenhill reviewed with representatives of Breitburn certain assumptions in QR Energy's financial model.  Representatives of RBC and Greenhill also provided information packets to representatives of Partnership A and one other MLP in early May.

60.     On May 9, 2014, representatives of RBC and Greenhill approached a private company regarding a merger with QR Energy that would result in the private company becoming a publicly listed company.

61.     On May 12, 2014, Washburn called Defendant Smith to convey Breitburn's interest in a proposed combination and to provide the terms of its indicative offer.  Breitburn proposed to acquire all of QR Energy's outstanding common units, Class B units, QR Energy Restricted units and QRE Performance units in exchange for an aggregate of 69.5 million Breitburn common units, and to acquire all of QR Energy's Class C units for $350 million in cash.   Breitburn's proposal also included the assumption by Breitburn of QR Energy's outstanding debt.  As of May 13, 2014, the implied equity value of Breitburn's offer was $1.759 billion.

62.     On May 13, 2014, Partnership A submitted an indicative offer to acquire QR Energy's outstanding common units, Class B units, QR Energy Restricted units and QRE Performance units in exchange for 40.9 million units in Partnership A and to acquire QR Energy's Class C units for $250 million in cash.   Partnership A's proposal also included the assumption by Partnership A of QR Energy's outstanding debt.   As of May 13, 2014, the implied equity value of Partnership A's offer was $1.487 billion.

63.     By the indicative process bid date of May 13, 2014, the other companies that were invited to participate in the process informed QR Energy or RBC and Greenhill that they had elected not to proceed in the sale process.

64.     On May 14, 2014, the Board held a special meeting to discuss the indicative bids from Breitburn and Partnership A.

65.     Also on May 14, 2014, QR Energy's conflicts committee discussed the status of the process and decided that it would be engaging Tudor, Pickering, Holt & Co. Securities Inc. ("TPH") as its financial advisor, and Bracewell & Giuliani LLP ("Bracewell & Giuliani") as its legal advisor, for purposes of evaluating any potential transaction presented to it by the Board.

66.     On May 15, 2014, representatives of RBC and Greenhill invited Breitburn to participate in the second and final phase of the process and notified Partnership A that its proposal was not acceptable and that it would not be invited to participate in the second and final phase of the process.   The Board did not instruct RBC or Greenhill to reach out to additional potential acquirers about a possible merger or acquisition, nor did the Board consider other strategic alternatives.

67.     On July 2, 2014, representatives of QR Energy, including Defendant Smith, met with representatives of Breitburn, including Washburn, to provide an update with respect to QR Energy's assets.   Representatives of QR Energy provided an operational update, addressed

Breitburn's model calculation of QR Energy's EBITDA that QR Energy believed had gaps, provided additional details on certain assets and illustrated the potential impact of all of these items on Breitburn's pro forma 2015 distributable cash flow.  The parties also discussed a projected timeline that targeted announcing a transaction by July 21, 2014.

68.    On the evening of July 22, 2014, the conflicts committee held a special meeting and reviewed with its advisors Breitburn's proposal, which would result in an exchange ratio per QR Energy common unit of 0.9856 and a distribution increase for QR Energy common unitholders to $2.05 per QR Energy common unit at the time of the merger (which would be announced by Breitburn in connection with announcement of the signing of the merger agreement).

69.    On July 23, 2014, the Breitburn Board of Directors held a telephonic board meeting at which it approved the Merger Agreement.  The Board voted unanimously to approve the Merger that same day.

70.    Early in the morning of July 24, 2014, the parties issued a joint press release announcing the Merger.  Each party also separately issued a press release reporting its respective second quarter earnings.

### C.    The Unfair Unit Price

71.    Following consummation of the Merger, QR Energy unitholders will be substantially diluted, owning just 37% of the combined company.

72.    Given the Partnership's recent strong performance and its positioning for growth, the Merger consideration is inadequate and significantly undervalues the Partnership.

73.    The Merger provides a meager premium of just 19% based on QR Energy's closing price on July 23, 2014, the last trading day before the Merger was announced.  This premium is significantly below the average one-day premium of 46.12% for comparable

transactions in the past three years.  Moreover, within the last 52-weeks, the Partnership has traded as high as $20.85 per share, a value only 7% below the Merger consideration.

74.    As such, various Wall Street analysts have set target prices for the Partnership in significant excess of the Merger consideration.  For example, on July 28, 2014, an analyst at Wunderlich Securities set a target price for the Partnership of $24.50, and aptly noted, "we believe [QR Energy] is trading at a significant discount to arbitrage parity."  Similarly, as early as September 18, 2013, an analyst at Landenburg Thalmann & Co. set a target price of $23.00, while an analyst at Robert W. Baird on July 27, 2014, concluded that, based on a modest 3.5% accretion to Breitburn, QRE holders "shouldn't anticipate a material sweetener from here."

75.    In addition, the Merger consideration fails to adequately compensate QR Energy unitholders for the significant synergies created by the Merger.  In a July 25, 2014 conference call with analysts and investors, Breitburn CEO Washburn explained that the Buyout Group has long admired QR Energy for its enviable MLP-friendly assets and engineering-focused operating strategy:

> This world-class portfolio of conventional properties in large, oil-rich basins fits perfectly with our asset base and improves our ability to deliver shallow, predictable decline rates that generate industry-leading margins.  Even more importantly, our enhanced scale, diversification and intellectual capital will better position Breitburn to efficiently use its capital to create long-term value for unitholders.

76.    Washburn also added that the combination offers immediate general and administrative expense savings, which could reach $13 million in the year after close, and called the deal "transformative" and "game changing."

77.    Defendant Smith also picked up on the significant synergies to be produced by the transaction, noting that the combination "creates an unrivaled operator of mature assets with exposure to nearly every conventional basin in the United States."  Defendant Smith continued to tout the Merger:

> Breitburn has a proven 26-year track record of making big oil fields bigger and we are excited to see that trend continue with the addition of our extensive inventory of organic growth projects.  We believe the immediate premium enjoyed by our unitholders will be surpassed by the value shared by all unitholders participating in the future success of the combined company.

78.     The inherent synergies provided by the Merger were not lost on the financial media.  As an analyst at The Motley Fool explained in an article dated July 24, 2014, "these synergies, along with the accretive nature of the transaction, will provide an immediate boost to investors. Breitburn...plans to increase its distribution by 7 cents/share, or 3.5% upon closing." An additional important aspect of the transaction noted in the article is that the Merger will solidify Breitburn's place as the second-largest upstream MLP. Thus, the analyst concluded that Breitburn "is adding scale where scale matters" and "[t]his really is a transformative acquisition for BreitBurn Energy Partners":

> That increased scale will enable it to better compete for deals in the future as it should lower the company's cost of capital while providing it with the scale it needs to be in the position to acquire larger asset packages.

79.     Despite the significant synergies inherent in the transaction for the Buyout Group, however, the Board failed to secure a fair price for either the intrinsic value of the Partnership's assets or the value of the Partnership's assets to the Buyout Group.

80.     Additionally, the Merger Agreement does not contain a "collar" guaranteeing QR Energy unitholders a minimum dollar threshold for their units.  Thus, they are at the mercy of the value of Breitburn's units at the time the Merger is effectuated, which may be affected by numerous factors and therefore have little or no relationship to the value of their QR Energy units at that time.  Should there be a major market shift in Breitburn's units, the consideration that QR Energy unitholders will receive for their units will be even lower.

81.     The trading price of Breitburn common units at the time the Merger was approved was at its highest price in the past few years.  However, at the time the exchange ratio was fixed,

QR Energy was aware that Breitburn expected to announce (i) second quarter 2014 EDITDA approximately 10% below its internal budget and approximately 6% below the average consensus expectation of analysts; (ii) year to date production that was below budget; (iii) higher capital expenditures associated with acceleration/increased activity in Texas; and (iv) greater than expected downtime in Florida and California.

82.     Thus, QR Energy was aware that as a result of the second quarter 2014 financial and operating results announcement, the trading price in Breitburn units might be depressed , which among other things would negatively impact the premium for QR Energy common units implied by the exchange ratio and the Breitburn unit distribution coverage ratio.

**D.     The Flawed Sales Process**

83.     The sales process was flawed in a number of respects.  In addition to those otherwise detailed herein:

  a.     The Board did not create a special committee to run the sales process, instead permitting Defendant Smith to negotiate directly with Washburn; and

  b.     The conflicts committee did not conduct an auction process for the acquisition of QR Energy or of the QR Energy common units held by the unaffiliated QR Energy common unitholders.

**E.     The Preclusive Deal Protection Devices**

84.     To the detriment of QR Energy unitholders, as part of the Merger Agreement, the Individual Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Merger a *fait accompli* and ensure that no competing offers will emerge for the Partnership.

85. The Merger Agreement contains a strict "no shop" provision prohibiting the members of the QRE GP Board from taking any affirmative action to comply with their fiduciary duties to maximize unitholder value, including soliciting alternative acquisition proposals or business combinations.

86. Specifically, § 7.3 of the Merger Agreement provides that:

> [T]he Partnership will not, and will cause its Subsidiaries and its and their respective directors, officers and employees not to, and will use reasonable best efforts to cause their respective other Representatives not to, directly or indirectly, (i) initiate, solicit, knowingly encourage or knowingly facilitate any inquiry, proposal or offer that would reasonably be expected to lead to an Alternative Proposal, or (ii) enter into or participate in any discussions or negotiations regarding, or furnish to any Person any non-public information with respect to, or that could reasonably be expected to lead to, any Alternative Proposal.

87. That same section provides a matching rights provision, whereby the Partnership must promptly notify Breitburn of the bidder's identity and the terms of the bidder's offer should it receive an unsolicited competing acquisition proposal.  Section 7(d) further requires the Board to keep Breitburn informed of all material developments with respect to the status and terms of any such proposal and to provide it with copies of any additional written proposals received by the Partnership or that the Partnership has delivered to any third party.

88. Upon receipt of a "Superior Proposal," QR Energy must then permit Breitburn to negotiate to make such adjustments in the terms and conditions of the merger agreement so that such superior proposal ceases to constitute a superior proposal.

89. The effect of these provisions is to prevent the Board from entering discussions or negotiations with other potential purchasers unless the Board can first determine that the competing acquisition proposal is, in fact, "superior," and even then, the QR Energy must permit Breitburn to match the competing acquisition proposal.  Consequently, this provision prevents QRE GP's Board from exercising their fiduciary duties and precludes an opportunity for a potential purchaser to emerge.

90.     Furthermore, the Merger Agreement provides that QR Energy must pay Breitburn a termination fee of $64,875,000 if the Partnership decides to pursue another competing offer, thereby essentially requiring that the alternative bidder agree to pay a naked premium for the right to provide QR Energy's unitholders with a superior offer.  A termination fee in this amount is unreasonably high for this type of transaction.

91.     Finally, in a further effort to lock up the Merger, Breitburn entered into a voting agreement (the "Voting Agreement") with QR Energy's affiliates, former owners of QRE GP, and certain of QA Holdings' subsidiaries, who collectively hold units representing approximately 37% of the votes of QR Energy's outstanding units, to vote all of their units (including QR Energy common units owned by them) in favor of the Merger Agreement and to take certain other specified actions in furtherance of the Merger.  Thus, the affirmative vote of unaffiliated QR Energy common unitholders holding a mere 13% of outstanding QR Energy units is all that is needed to approve the merger proposal.  The Voting Agreement operates as a deterrent to other potential purchasers.

92.     Ultimately, these preclusive deal protection devices illegally restrain the Partnership's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Partnership.  The circumstances under which the Board may respond to an unsolicited alternative acquisition proposal that constitutes, or would reasonably be expected to constitute, a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.   These provisions operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Partnership.

F.      **The Partnership's Directors and Officers Are Receiving Unique Benefits**

93.     QRE GP's directors and officers will receive unique benefits in connection with the Merger.

94.     If the Merger is completed, each QRE Restricted unit restricted unit issued under QR Energy's LTIP that is subject to time-based vesting that is outstanding and unvested immediately prior to the effective time will automatically become fully vested and convert into the right to receive the unit consideration.  In the case of awards of QRE Performance units that are outstanding immediately prior to the effective time, the awards will automatically vest and be settled in a number of QR Energy common units based on actual attainment of the applicable performance goal(s) as of two business days prior to the effective time, and such resulting QR Energy common units will be converted at the effective time into the right to receive the unit consideration

95.     The following table sets forth the aggregate number of QRE Restricted units and number of common units subject to outstanding QRE Performance units for certain of QR Energy's officers and directors, as well as the estimated value payable in the Merger with respect to such awards.  For purposes of this table, the per unit value of the Merger Consideration was estimated to be equal to $21.62, determined by multiplying the exchange ratio by $21.94, the average closing price of Breitburn common units over the first five business days following the first public announcement of the transaction.

| Name (1) | Value of Restricted Units | | Value of Performance Units | | Total Estimated Value of Awards ($) |
| | Number of Units (#) | Value ($) | Number of Units (#) (2) | Value ($) (3) | |
| --- | --- | --- | --- | --- | --- |
| *Executive Officers* | | | | | |
| Alan L. Smith | 26,258 | $ 567,698 | 217,879 | $ 5,309,930 | $ 5,877,628 |
| John H. Campbell, Jr. | 20,795 | $ 449,588 | 172,338 | $ 4,198,871 | $ 4,648,459 |
| Cedric W. Burgher | 96,889 | $ 2,094,740 | 167,440 | $ 4,043,155 | $ 6,137,895 |
| Mark P. Castiglione | 26,835 | $ 580,173 | 23,101 | $ 563,312 | $ 1,143,485 |
| Gregory S. Roden | 27,975 | $ 604,820 | 23,806 | $ 580,598 | $ 1,185,418 |

96.     Pursuant to the terms of the merger agreement and in accordance with the QR Energy partnership agreement, immediately prior to the effective time, up to 6,748,067 additional QRE Class B units will be issued to QR Energy Holdings, LLC and QR Holdings (QRE), LLC, entities which are indirectly controlled by certain of QRE GP's executive officers and directors. These additional Class B units will be converted at the effective time into the right to receive the Merger Consideration.  Currently, Defendant Smith, QRE GP's CEO and director, Defendant Campbell QRE GP's president, chief operating officer and director and Defendants VanLoh and Neugebauer, directors of QRE GP indirectly own 100% of the outstanding equity interests in the two entities which will be issued additional Class B units upon the effective time. In addition, it is currently expected that prior to the effective time certain of QRE GP's executive officers will receive additional grants of equity interests in QR Energy Holdings, LLC, which would result in them receiving an indirect benefit from the issuance of the Contingent Class B units upon the effective time of the merger.

97.     A number of so-called "Contingent Class B units" are owned by certain of QR Energy management and board members through ownership interests in QR Holdings (QRE), LLC and QR Energy Holdings, LLC, the former owners of QRE GP.  In connection with the Merger, a number of QR Energy's Contingent Class B units, equal to the "Adjusted Class B Amount"[1] will, automatically and without any action on the part of the holders of such Contingent Class B units, be issued, the performance-based conditions thereon shall lapse, and such Contingent Class B units will be treated as issued and outstanding Class B units as of immediately prior to the effective time.

---

[1] The "Adjusted Class B Amount" equals (x) 6,748,067 minus (y) the excess of (A) the number of QR Energy common units issued in respect of the QRE Performance units as described above over (B) 383,900 and minus (z) the number, if any, of Contingent Class B units issued pursuant to Section 7.4(d) of QRE's partnership agreement (which provides that QR Energy should distribute Contingent Class B units on an annual basis if a certain three-part partnership performance test is met).

98.     Moreover, while the Partnership's public unitholders will receive inadequate consideration for their units, certain officers and Board members have negotiated positions for themselves in the surviving entity.  Although Breitburn's senior management team will lead the combined company, it intends to employ QR Energy's entire roster of engineering, operations, and support staff, excluding those that are being retained by Quantum Resources Management, LLC.  Additionally, Breitburn will add a new member to its Board of Directors after closing, and Breitburn and QR Energy will mutually agree upon that individual.

99.     Thus, while the Merger is not in the best interest of QR Energy unitholders, it will produce lucrative benefits for the Partnership's officers and directors.

### G.     The Materially Misleading and/or Incomplete Registration Statement

100.     On August 20, 2014, Breitburn filed the Form S-4 Registration Statement with the SEC and disseminated it to the Partnership's public unitholders in an attempt to convince unitholders to vote in favor of the Merger.  The Registration Statement fails to provide the Partnership's unitholders with material information and/or provides them with materially misleading information.  Without such information QR Energy unitholders cannot make a fully informed decision about whether to vote in favor of the Merger.

*Disclosures Concerning the Flawed Sale Process*

101.     The Registration Statement fails to disclose material information leading up to the Merger.

102.     The Registration Statement, at page 52, states:

The QRE GP board of directors has periodically evaluated and considered a variety of financial and strategic opportunities as part of its strategy to maximize unitholder value.

QRE has been approached from time-to-time by other upstream master limited partnerships ("MLPs") regarding strategic opportunities.  In August 2013, Alan L. Smith, Chief Executive Officer of QRE GP, was approached on an unsolicited basis by the Chief Executive Officer of another upstream MLP (which we refer to

as "Partnership A") regarding a potential strategic combination with Partnership A.  At this time, QRE was not actively seeking to engage in a strategic transaction with an unaffiliated third party.  No details were discussed and no offer was made by Partnership A at that time.

103.    The Registration Statement fails to disclose what specific actions the Board has taken prior to the announcement of the Merger to review or discuss potential alternatives, including but not limited to the formation of any committees to monitor or pursue strategic options, the receipt or solicitation of offers or inquires for various strategic alternatives, and the retention of a financial advisor to evaluate or otherwise look into potential strategic options for the Partnership.  This information is material to unitholders voting on the Merger because it is important in accessing (i) the motivations of the Board and any potential outside influence on the Board when shopping the Partnership; and (ii) whether the Board took reasonable steps in the Merger to maximize unitholder value when shopping the Partnership.

104.    The Registration Statement also fails to disclose why, after receiving indications of interest from Partnership A, the QRE GP Board did not establish a special committee to evaluate and consider this indication of interest or other potential offers or strategic proposals.

105.    The Registration Statement at page 52 states:

QRE management and board of directors have discussed from time to time the potential benefits of combining QRE with other upstream MLPs.  QRE management concluded in early March 2014 that market conditions and recent developments at QRE made it constructive to discuss strategic alternatives, including a potential process to consider a potential merger of QRE with other upstream MLPs.

106.    The Registration Statement fails to disclose what other "strategic alternatives" the Board considered, nor the assumptions or rationale relied upon by the Board in determining that a sale transaction, as opposed to a standalone or strategic acquisition, was the appropriate means for increasing unitholder value.

107.    The Registration Statement at page 52 states:

On and around March 11, 2014, Mr. Smith and representatives of RBC Capital Markets, LLC ("RBC"), which had acted as QRE's financial advisor on various matters for several years and was very familiar with both QRE and the industry, approached six upstream MLPs, including Partnership A, to explore whether there was a possibility of a strategic combination that would make sense for QRE. Mr. Smith telephoned the CEOs of five upstream MLPs, including Halbert S. Washburn, Chief Executive Officer of Breitburn, on March 11, 2014, and RBC contacted the representatives of one additional upstream MLP.

108.   The Registration Statement fails to disclose the number of potential contacts QR Energy and RBC considered, and the makeup of the potential contacts.  This information is material to unitholders voting on the Merger because it is important in determining whether the Board took reasonable steps in shopping the Partnership to all potential bidders who may have bid on the Partnership.

109.   The Registration Statement at page 53 states:

On April 28, 2014, representatives of RBC and Greenhill sent out indicative bid process letters requesting indications of interest by May 13, 2014.  A request was made in the indications of interest to include specific items including the economic consideration for a prospective combination.  The expectation for consideration was outlined as unit-for-unit exchanges of all QRE common units, Class B units, QRE Restricted units and QRE Performance units, and cash consideration of $350 million for the outstanding Class C units, which is equal to the liquidation preference of the Class C units.

110.   The Registration Statement fails to disclose why the QRE GP Board determined that a units-for-units transaction was more beneficial to QR Energy unitholders than a units-for-cash transaction.

111.   The Registration Statement at page 53 states:

On May 9, 2014, representatives of RBC and Greenhill approached a private company regarding a merger with QRE that would result in the private company becoming a publicly listed company.  RBC and Greenhill had similar conversations with other large private and public companies from time-to-time during ordinary course investment banking meetings regarding various strategic combinations in order to gauge interest from a broader group of potential counterparties on an anonymous basis, including among others a potential combination with QRE.

112.    The Registration Statement fails to disclose the details of these discussions, including what, if anything this "private company" or other "large private and public companies" did in response to these overtures.

113.    The Registration Statement at page 54 states:

By the indicative process bid date of May 13, 2014, the other companies that were invited to participate in the process informed QRE or RBC and Greenhill that they had elected not to proceed in the QRE process.

114.    The Registration Statement fails to disclose material information concerning why the potentially interested parties withdrew from the process and whether due diligence was provided to the potentially interested parties before withdrawing from the process.  Further, the Registration Statement fails to disclose the rationale for the Board not instructing RBC to seek out additional parties about the possibility of an acquisition of QR Energy.  This information is material to QR Energy unitholders because it is important to assessing whether the Board took reasonable steps to properly shop the Partnership and increase unitholder value.

115.    The Registration Statement at page 55 states that "Mr. Smith sought Mr. Washburn's interest in moving forward with the process and recommended they work through the asset and modeling concerns raised previously."

116.    The Registration Statement fails to disclose material information concerning what "asset and modeling concerns" were raised previously, including the nature and effect of those concerns.

117.    The Registration Statement at page 57, when describing a June 16, 2014 meeting of the conflicts committee with TPH, states that "[m]embers of the conflicts committee requested of TPH several additional analyses for the conflicts committee's consideration at its next meeting."

118.    The Registration Statement fails to disclose material information concerning these "additional analyses," including what analyses were requested and why.

*Disclosures Concerning the Prospective Financial Information of QR Energy and Breitburn*

119.    Defendants failed to disclose a fair summary of the financial projections of the Partnership as provided by QR Energy management and relied upon by Greenhill and TPH for purposes of their analyses, for the following line items:

     a.   Production (post-2018)
     b.   Revenue
     c.   EBITDA (post-2018)
     d.   Net interest expense, including gains and losses on interest rate derivative contracts
     e.   Depreciation, depletion, and amortization
     f.   Accretion of asset retirement obligations
     g.   Gains or losses due to effects of change in prices on natural gas imbalances
     h.   Gains or losses on commodity derivative contracts, net
     i.   Cash received or paid on the settlement of commodity derivative contracts, net
     j.   Income tax expense or benefit
     k.   Other income or expense
     l.   Interest income or expense
     m.   Impairments
     n.   Non-cash general and administrative expenses, and acquisition and transaction costs
     o.   Pension and postretirement expense or credit
     p.   Net income
     q.   Growth capital expenditures
     r.   Maintenance capital expenditures
     s.   Changes in net working capital
     t.   Unlevered free cash flow
     u.   Distributable cash flow
     v.   Distributable cash flow per share
     w.   Distributions
     x.   Distributions per share

120.    Defendants failed to disclose a fair summary of the financial projections for Breitburn, as relied upon by Greenhill and TPH for purposes of their analyses, for the following line items:

      a.   Production
      b.   Revenue
      c.   EBITDA
      d.   Depreciation, depletion, and amortization
      e.   Capital expenditures
      f.   Changes in net working capital
      g.   Unlevered free cash flow
      h.   Net Income
      i.   Distributable cash flow
      j.   Distributable cash flow per share
      k.   Distributions
      l.   Distributions per share

121.    Defendants failed to disclose the estimates of proved, probable, and possible oil and gas reserves for QR Energy and Breitburn from each of the following sources:

      a.   QRE Consultant Estimates
      b.   QRE 3P Database
      c.   Breitburn Consultant Estimates
      d.   Breitburn Internal Estimates
      e.   Breitburn 3P Database
      f.   Breitburn Reserve Reports

*Disclosures Concerning Greenhill's Financial Analyses*

122.    The Registration Statement fails to disclose certain key data and inputs underlying the financial analyses relied upon by Greenhill, QRE GP's financial advisor, in rendering its fairness opinion.

123.    With respect to Greenhill's *Contribution Analysis of QRE and Breitburn* the Registration Statement fails to disclose the specific risk factors used by Greenhill in determining the implied contribution of each of QR Energy and Breitburn to the combined entity's risked 3P reserve PV-8 and risked PDP reserve PV-8.

124.    With respect to Greenhill's *NAV Analysis of QR Energy and Breitburn* the Registration Statement fails to disclose the specific risk factors used by Greenhill in valuing the risked 3P Net Asset Value per unit for both Breitburn and QR Energy, individually.

125.    With respect to Greenhill's *Comparable Company Analyses* the Registration Statement fails to disclose whether Greenhill performed any type of benchmarking analyses for either Breitburn or QR Energy in relation to the selected comparable companies.

126.    With respect to Greenhill's *Pro Forma Analysis* the Registration Statement fails to disclose: (i) the specific levels of accretion to QR Energy's distributable cash flow per unit in 2015 and 2016 indicated by Greenhill's analysis; and (ii) whether Greenhill evaluated the accretion/dilution to Breitburn as well.

127.    The Registration Statement further fails to disclose the estimated synergies that Greenhill did not take into account in arriving at its fairness opinion.

*Disclosures Concerning TPH's Financial Analyses*

128.    With respect to TPH's *Net Asset Valuation Analysis* the Registration Statement fails to disclose: (i) the specific risk factors, as risked by QR Energy management and used by TPH in its analysis; (ii) the future values and the present value of existing hedges and net profits interest burdens as used by TPH in its analysis; (iii) the expected income taxes to be paid, or the tax rate used in the forecasts for QR Energy; and (iv) the amounts of net debt and preferred and minority interests for QR Energy.

129.    With respect to TPH's *Discounted Cash Flow Analysis* the Registration Statement fails to disclose: (i) the specific cash flow metric discounted by TPH in its analysis; and (ii) the range of implied perpetuity growth rates derived by TPH in its analysis based on its application 7.5x to 9.5x 2018 EBITDA multiples.

130.    With respect to TPH's *Present Value of Future Unit Price* the Registration Statement fails to disclose the individual inputs and assumptions that TPH used for the selection of yields of 8.0%-11.0%.

131.    With respect to TPH's *Relative Valuation Analysis* the Registration Statement fails to disclose: (i) the specific risk factors, as risked by QR Energy management and used by TPH to determine a Net Asset Value calculation for Breitburn; (ii) the specific cash flow metric discounted by TPH in its *Discounted Cash Flow Analysis* for Breitburn; (iii) the specific discount rates used by TPH in its *Discounted Cash Flow Analysis* for Breitburn; (iv) the terminal multiples and/or perpetuity growth rates used by TPH to calculate the terminal value in its *Discounted Cash Flow Analysis* for Breitburn; (v) the range of implied perpetuity growth rates or implied terminal multiples derived by TPH in its *Discounted Cash Flow Analysis* for Breitburn; (vi) the range of yields used, as well as the individual inputs and assumptions used in the selection of yields, TPH to value projected standalone distributions for Breitburn; and (vii) the discount rates as used by TPH in its present value of future share price analysis of projected standalone distributions for Breitburn.

132.    With respect to TPH's *Contribution Analysis* the Registration Statement fails to disclose the specific relative contributions of QR Energy and Breitburn, as indicated by TPH in its analysis, for each of the observed metrics.

133.    With respect to TPH's *Select Public Company Trading Statistics Analysis* the Registration Statement fails to disclose: (i)  whether TPH performed any type of benchmarking analyses for QR Energy in relation to the selected comparable companies; and (ii) the following multiples for each of the selected public companies observed by TPH in its analysis:

> a.   Enterprise Value / 2014E EBITDAX
> b.   Enterprise Value / 2015E EBITDAX
> c.   Enterprise Value / Proved Reserves ($/Boe)

    d.   Enterprise Value / Current Production ($/Boe)

    e.   Enterprise Value / 2014E Production ($/Boe)

    f.   Enterprise Value / Proved Reserves PV-10

134.    With respect to TPH's *Select Corporate Transaction Statistics Analysis* the Registration Statement fails to disclose: (i) the multiples for each of the selected comparable transactions observed by TPH in its analysis; and (ii) whether TPH performed any type of benchmarking analyses for QR Energy in relation to the selected comparable transactions.

135.    With respect to TPH's *Pro Forma Accretion/Dilution Analysis* the Registration Statement fails to disclose the accretion/dilution expected for Breitburn unitholders.

136.    The Registration Statement further fails to disclose the operating synergies as projected by QR Energy management and used by TPH in its analyses.

*Disclosures Regarding Services and Fees Received By TPH*

137.    The Registration Statement fails to disclose the specific services TPH has provided to either QR Energy or Breitburn in the last two years and how much compensation was received for services rendered.

**VII.   CLAIMS FOR RELIEF**

**COUNT I**

**On Behalf of Plaintiff and the Class for Violations of Section 14(a)
of the Exchange Act and Rule 14a-9 Promulgated Thereunder
Against the Partnership and the Individual Defendants**

138.    Plaintiff repeats all previous allegations as if set forth in full herein.

139.    The Individual Defendants have issued the Registration Statement with the intention of soliciting unitholder support of the Merger.

140.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any

material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

141.    Specifically, the Registration Statement violates Section 14(a) and Rule 14a-9 because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, the Individual Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

142.    The Individual Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

143.    The misrepresentations and omissions in the Registration Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Merger.

144.    Because of the false and misleading statements in the Registration Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## COUNT II

**On Behalf of Plaintiff and the Class for Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

145.    Plaintiff brings this Exchange Act claim on behalf of himself as individuals and on behalf of all other QR Energy unitholders.

146.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

147.    The Individual Defendants acted as controlling persons of QR Energy within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of QR Energy, and participation in and/or awareness of the Partnership's

operations and/or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Partnership, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

148.    Each of the Individual Defendants were provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

149.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Partnership, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger. They were, thus, directly involved in the making of this document.

150.    In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger.  The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

151.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

152.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling

persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

**COUNT III**

**On Behalf of Plaintiff and the Class Against the Individual Defendants for<br>Breach of Fiduciary Duties**

153.    Plaintiff repeats all previous allegations as if set forth in full herein.

154.    The Individual Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care and loyalty owed to the unitholders of QR Energy and have acted to put their personal interests ahead of the interests of QR Energy unitholders.  The Individual Defendants' recommendation of the Merger will result in change of control of the Partnership which imposes heightened fiduciary responsibilities to maximize QR Energy's value for the benefit of the unitholders and requires enhanced scrutiny by the Court.

155.    The Individual Defendants have breached their fiduciary duties of loyalty, good faith, and independence owed to the unitholders of QR Energy because, among other reasons:

      a.    they failed to take steps to maximize the value of QR Energy to its public unitholders and took steps to avoid competitive bidding;

      b.    they failed to properly value QR Energy;

      c.    they failed to take the necessary steps to comply with their fiduciary duties and QR Energy's LPA; and

      d.    they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Merger.

156.    As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive

their fair portion of the value of QR Energy's assets and will be prevented from benefiting from a value-maximizing transaction.

157.   Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Merger, to the irreparable harm of the Class.

158.   Plaintiff and the Class have no adequate remedy at law.

## COUNT IV

**On Behalf of Plaintiff and the Class Against the Individual Defendants for
Breach of Fiduciary Duty – Disclosure**

159.   Plaintiff repeats all previous allegations as if set forth in full herein.

160.   The fiduciary duties of the Individual Defendants in the circumstances of the Merger require them to disclose in a non-misleading way to Plaintiff and the Class all information material to the decisions confronting QR Energy unitholders.

161.   As set forth above, the Individual Defendants have breached their fiduciary duty through materially misleading disclosures and material disclosure omissions.

162.   As a result, Plaintiff and the Class members are being harmed irreparably.

163.   Plaintiff and the Class have no adequate remedy at law.

## COUNT V

**On Behalf of Plaintiff and the Class Against the Individual Defendants and QRE GP for
Breach of Express and Implied Duties in Connection with the Merger**

164.   Plaintiff repeats all previous allegations as if set forth in full herein.

165.   QRE GP and the Individual Defendants owed the Partnership and its public unitholders duties as defined in the LPA.  Further, QR Energy, QRE GP and the Individual Defendants owed the public unitholders the implied duty of good faith and fair dealing, which the LPA could not eliminate.

166.    QR Energy, GRE GP and the Individual Defendants breached their express obligations under the LPA and the implied duty of good faith and fair dealing by, for example, causing QR Energy to enter into the Merger Agreement and pursue the Merger, and by failing to disclose material information to allow QR Energy unitholders to cast a fully informed vote on the Merger.

167.    By reason of the foregoing, QRE GP and the Individual Defendants approved the Proposed Transaction in bad faith.

168.    Plaintiff and the other members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

### COUNT VI

**On Behalf of Plaintiff and the Class Against the Individual Defendants and QR Energy, for Aiding and Abetting QRE GP's Breach of Express and Implied Duties in Connection with the Proposed Transaction**

169.    Plaintiff repeats all previous allegations as if set forth in full herein.

170.    As set forth above, QRE GP owed QR Energy's public unitholders duties and obligations that QRE GP breached in respect to the Merger.

171.    Further, each of the other Defendants knowingly participated in the foregoing breaches by directly or indirectly causing QRE GP to pursue the Merger and enter into the Merger Agreement, thereby causing damage to Plaintiff and the Class.

172.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## COUNT VII

**On Behalf of Plaintiff and the Class Against the
Buyout Group and Merger Sub for Aiding and Abetting the Individual Defendants'
Breach of Express and Implied Duties**

173.     Plaintiff repeats all previous allegations as if set forth in full herein.

174.     As alleged in more detail above, Defendant Buyout Group has aided and abetted the Individual Defendants' breaches of fiduciary duties.

175.     As a result, Plaintiff and the Class members are being harmed.

176.     Plaintiff and the Class have no adequate remedy at law.

## VIII.   JURY DEMAND

177.     Plaintiff demands a trial by jury.

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally, as follows:

A.     declaring this action to be a class action and certifying Plaintiff as  Class representative and his counsel as Class counsel;

B.     enjoining, preliminarily and permanently, the Merger

C.     directing Defendants to fairly and fully disclose all material information concerning the Merger;

D.     in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

E.     directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

F.      awarding Plaintiff the costs of this action, including a reasonable allowance for

the fees and expenses of Plaintiff's attorneys and experts; and

G.      granting Plaintiff and the other members of the Class such further relief as the

Court deems just and proper.

DATED:  September 12, 2014.

Respectfully submitted,


_____*/s/ Thomas E. Bilek*_____
Thomas E. Bilek
TX Bar 02313525 / SDTX Bar 9338
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720

L. Kendall Satterfield
Michael G. McLellan
Rosalee B.C. Thomas
**FINKELSTEIN THOMPSON LLP**
1077 30th Street NW, Suite 150
Washington, D.C.  20007
(202) 337-8000

*Attorneys for Plaintiff*